## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

EASTERN COMPUTER EXCHANGE,
INC., a corporation,

       Plaintiff,

          v.

SYNNEFO TECHNOLOGY SOLUTIONS,
INC., a corporation

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

MAY 9, 2011

### DECLARATION OF JAMES SOJA IN SUPPORT OF APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

JAMES SOJA, having been duly sworn, hereby declares and states as follows:

1. I am employed by Eastern Computer Exchange, Inc. ("Eastern") as a Senior Project Manager responsible for multiple core Project implementations.

2. I submit this Declaration in support of Eastern's application for a Temporary Restraining Order and Preliminary Injunction enjoining Synnefo from misappropriating Eastern's proprietary and confidential information in connection with the Whirlpool Virtual Desktop Implementation project.

3. The statements in this Affidavit are based upon my personal knowledge and investigation of the facts relating to this matter.

4. In July of 2010, I entered into discussions with Synnefo Technology Solutions, Inc. ("Synnefo") for the purpose of engaging Synnefo to assist Eastern with servicing our client, VMWare, Inc., in a project to design, develop, implement, and manage a Virtual Desktop Implementation ("VDI") for Whirlpool.

5. For this project, Eastern utilized unique methodologies in architecting, building, deploying, and supporting the VDI environments at Whirlpool. This included designing an operating system build-out, crafting a specific, technical architectural solution for the VDI project and developing protocol standards for the project.

6. Pursuant to the Agreements, Synnefo was to assist Eastern in providing personnel to staff the VDI implementation within Whirlpool, working as a sub-contractor of Eastern, at its sole direction.

7. In July 2010, Synnefo and Eastern entered into a Master Agreement for sub-contractor services (Ex. A) and a Non-Disclosure Agreement (Ex. B).

8. Thereafter, Synnefo personnel were identified pursuant to specifications dictated by Eastern. Candidates were interviewed by myself and others at Eastern, and hired to perform VDI delivery services to Whirlpool.

9. I was responsible for the overall project management supervision for Eastern for the deployment of the VDI project from October through December, 2010, and subsequent extensions of that same project from January through April 15, 2011.

10. During this time, Synnefo was given full access to Eastern's unique, confidential and proprietary approach to VDI designs through exposure to and knowledge of our design documents, project deliverables, team notes and email, and strategy conferences and decisions.

11. Synnefo was provided by Eastern with access to our team's Sharepoint, a reporting and technical status updating resource, including operation access to OneNote status reporting, timesheets, deployment methodology documentation, UseCase software, and Eastern's Internet Protocol standards for the project.

12. Synnefo had access to and was trained in Eastern's approach, know-how, strategy, and processes for defining, targeting, and solving for the VDI environment requirements at Whirlpool through their daily involvement with the project and Eastern's personnel and materials. Synnefo was provided access to Eastern's project methodologies, application virtualization, and information regarding the conceptual roll-out of the entire VDI project.

13. Synnefo had access to Eastern's confidential desktop designs and data, as well as Eastern's confidential and proprietary processes for supporting those designs and solutions at Whirlpool.  Synnefo had access to Eastern's proprietary methods of deploying VDI from end user communications to image creation and image sizing.

14. Under Eastern's direction and provisioning, Synnefo was granted direct onsite and electronic access to Eastern's Whirlpool Technical Detail, which set out the strategy and information necessary to achieve a successful VDI solution for Whirlpool.

15. Using Eastern's specific, technical architectural solution, know-how, and design, Synnefo assisted Eastern in the VDI implementation at Whirlpool's corporate location.

16. Using Eastern's confidential information regarding the operating system structure and design of the VDI solution for Whirlpool, Synnefo had access to information that is critical to Eastern's successful performance of the VDI solution for Whirlpool.

17. Using Eastern's confidential email system, Synnefo had access to all email addressing Eastern's confidential designs and solutions for its' VDI business. Such proprietary and confidential information impacts Eastern's role and singularity in the marketplace.

18. Using Eastern's expertise and experience, Synnefo had access to the operating system build-out and structure for Whirlpool's systems, and shared in the capacity Eastern identified, established, and provided to Whirlpool.

19. Eastern owns all the material, documentation, deliverables, and other information, such as technical data, formulae, and processes involved in the Whirlpool VDI project.

20. Eastern withdrew from the project on April 15, 2011.

21. Later, I learned that Synnefo was retained to work on the Whirlpool VDI project and has misappropriated and is currently using and distributing Eastern's

confidential and proprietary information for Synnefo's business and economic benefit.

22. This confidential information was developed by Eastern over many years and is based on Eastern's insights into the business and countless man hours and resources at a significant cost. It is impossible for a competitor to develop this information unless they devote comparable time and expense to the effort. Even if a competitor was to make the required effort, there is no guarantee that they would ever achieve the insights necessary to make the effort a success, as Eastern has done.

23. Eastern takes specific steps to safeguard the confidentiality of this type of business information. Eastern requires all employees and subcontractors to enter into a Non-Disclosure Agreement, which requires that all business information be maintained strictly confidential during and after employment. Computer systems are heavily safeguarded and access to computer information is password protected.

24. There is no possible way that Synnefo can carry out its current function at Whirlpool VDI project without misappropriating Eastern's confidential and proprietary information obtained as employees of Eastern.

25. On May 11, 2011, Eastern put Synnefo on written notice that it cease and desist the use of Eastern's proprietary and confidential information.

26. Unless Synnefo is enjoined from improperly obtaining, using and disclosing such confidential information, Eastern will face irreparable harm.

27. To the best of my knowledge, the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _9_ th day of May, 2011 at Flemington, New Jersey.

_James Soja_ (signature)

James Soja

JOHN J. LOMBARDI
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Jan. 4, 2016

Notary Public

# EXHIBIT A

(c) The terms of this Agreement are based upon an Agreement prepared by the National Association of Computer Consultant Businesses and are subject to the copyright of that Association.  Any use of any language in this Agreement by anyone who is not a member in good standing of that Association is prohibited and will subject the user to damages as well as other civil penalties.

## CLIENT AGREEMENT

AGREEMENT made effective as of the 1st day of July, 2010, between **Synnefo Technology Solutions Inc.** (hereinafter "**Synnefo**"), with offices at 107 E Commerce Drive, Schaumburg, Illinois  60173 Phone 847-241-4901 and **EASTERN COMPUTER EXCHANGE, INC.** (hereinafter "**Eastern**") with offices at 105 Cascade Blvd, Milford, CT 06460.

Whereas **Synnefo** is in the business of locating for **Eastern**, according to their specifications, technical personnel (hereinafter used in the plural to refer to one or more such personnel) to provide services to such clients, and performing as stated herein; and

Whereas **Eastern** from time to time desires the services of one or more of such technical personnel; and

Whereas **Synnefo** and **Eastern** wish to enter into an agreement pursuant to which **Synnefo** will arrange with such technical personnel for them to provide their services to **Eastern**;

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, **Synnefo** and **Eastern** agree as follows:

1. **SERVICES PROVIDED UNDER PURCHASE ORDER.**  For any technical personnel who will be performing services for **Eastern** pursuant to this Agreement, **Synnefo** will issue and **Eastern** will execute a Purchase Order in the form attached as Appendix A hereto referencing its incorporation of the terms and conditions of this Agreement and stating the name(s) and the payment rate(s) of the personnel, duration of services, brief description of project, authorization of additional costs beyond the payment rate(s) (such as travel, parking, drug testing), and any other terms to which **Synnefo** and the **Eastern** may choose to agree.  In the event of a conflict between the terms of this Agreement and the terms of any Purchase Order, the terms of this Agreement shall control unless the Purchase Order specifically (and not generally) identifies the conflicting terms in this Agreement and explicitly states that such terms shall not apply but shall instead be superseded by the Purchase Order.  The Purchase Order will be signed by an authorized representative of **Eastern**.  Upon expiration of a Purchase Order, to the extent that any services performed by one or more technical personnel are thereafter provided on the same or a different project, they shall be provided under the terms of this Agreement.

2. **BILLING AND PAYMENT.**  **Synnefo** will bill **Eastern** through invoices issued to **Eastern** in arrears on a monthly basis for services provided by technical personnel and associated costs, as approved by **Eastern**, except that **Synnefo** has sole discretion to bill on a less frequent basis if it deems it appropriate to do so.  **Eastern** will pay **Synnefo** within 30 days from the date of such invoice, unless some other time has been agreed to in the Purchase Order, according to the rates and terms of the Purchase Order; provided, however, that **Synnefo** may inform **Eastern** that some period less than 30 days shall be allowed for payment where **Eastern** is delinquent in payment of any sum due **Synnefo**, or **Eastern's** previous payment record or financial condition so warrants. Any late invoicing by **Synnefo** shall not affect the obligation of the **Eastern** to pay for the services covered by that invoice.

3. **ACCEPTANCE OF SERVICES.**  **Eastern's** Project Manager or other agent shall review for approval each week the time records of technical personnel on a form provided by **Synnefo** to the

technical personnel and submitted to **Eastern**. **Eastern's** approval of such time records (including, but not limited to, costs of any applicable overtime rates, travel, per diem and other costs stated thereon) shall be evidenced by its signature thereon and such approval shall constitute acceptance of the work performed by technical personnel and **Eastern's** agreement to pay **Synnefo** as stated herein. Acceptance by **Eastern** shall not be unreasonably withheld and any refusal to accept shall be noted on the time record for the relevant week, with a written explanation of the reasons that the work was not acceptable and failure to so note such refusal shall constitute acceptance. Nothing herein shall eliminate **Eastern's** obligation to pay **Synnefo** for any services provided by technical personnel which **Eastern** has approved by some other means.

4.  **ABILITY TO PAY.** **Eastern** warrants that it is able and willing to pay for the services of technical personnel providing services under this Agreement. **Eastern** will provide **Synnefo** with suitable credit and financial information, as requested, including credit and financial references which **Eastern** agrees that **Synnefo** may contact to obtain information about **Eastern**. If **Synnefo** determines that **Eastern's** credit rating or financial condition is unsatisfactory, in the discretion of **Synnefo**, then **Synnefo** may terminate its obligations under this Agreement upon notification to **Eastern**.

5.  **TECHNICAL PERSONNEL NOT EMPLOYEES OF EASTERN.** **Synnefo** and **Eastern** agree that for purposes of FICA, FUTA and income tax withholding, as well as for purposes of any pension plan or health benefit plan maintained by **Eastern** for its own employees, or any insurance plan required by law (i.e., workers' compensation), the technical personnel supplying services under this Agreement are not employees of **Eastern**.

6.  **EMPLOYMENT OR CONTRACTING OF PERSONNEL.** During the period covered by any Purchase Order and extensions thereof pursuant to this Agreement, or when **Eastern** is provided with the name of a technical personnel but determines not to use the services of such personnel so that no Purchase Order is written covering that personnel, **Eastern** will not directly or indirectly, other than through **Synnefo**, solicit for hire, contract with, or engage or receive the services of, any technical personnel located by **Synnefo** for **Eastern**.

For purposes of this section 6 of the Agreement, the term "**Eastern**" includes any customers of the **Eastern** for which **Synnefo** referred such technical personnel to **Eastern** to provide services under this Agreement (whether or not such services were performed) and also includes any successors, assigns, subsidiaries, parents, and partners of **Eastern**, as well as other affiliates of **Eastern** with at least fifty per cent (50%) common ownership of **Eastern**.

7.  **DUTIES AND SUBSTITUTION OF TECHNICAL PERSONNEL.** **Synnefo** will locate technical personnel for **Eastern** according to the qualifications, experience, and project requirements set forth by **Eastern** and given to **Synnefo**. The work to be performed by the technical personnel providing services under this Agreement shall be set out by **Eastern** and stated in the Purchase Order. The technical personnel shall report the results of the work, to the extent required by **Eastern**, to **Eastern's** Project Manager or other designated official, but the primary control over such personnel shall be exercised by **Synnefo** or, in the case of such personnel who is a valid independent contractor, by that personnel itself. Because **Eastern** has the opportunity to interview all technical personnel located by **Synnefo** prior to their commencement of any services for **Eastern**, **Synnefo** shall have no liability to **Eastern** if such personnel are determined by **Eastern** not to meet its requirements and **Eastern** shall not be relieved of making payments to **Synnefo** for the services provided by such personnel up to the time that they are terminated in accordance with this Agreement. However, if the services of any personnel providing services under this

Agreement are terminated and **Eastern** requests substitute personnel, **Synnefo** hereby agrees to make reasonable efforts to locate substitute personnel.

8. <u>**NOTICE OF TERMINATION OF SERVICES.**</u> **Eastern** agrees to notify **Synnefo** in writing ten (10) business days prior to its termination of any services of the technical personnel covered by this Agreement regardless of whether such termination comes before, is coincident with, or follows the duration date set forth in a written Purchase Order covering such services, provided however that **Eastern** may terminate such services immediately upon notice to **Synnefo** for cause or when termination is due to matters completely beyond the control of **Eastern**. In the event that **Synnefo** plans to terminate without cause or reassign any technical personnel performing services under this Agreement as **Synnefo**'s employees, it shall give **Eastern** at least 10 business days prior notice. If **Synnefo** plans to terminate any such personnel for cause, it shall give **Eastern** at least 1 day's prior notice. If any technical personnel providing services under this Agreement has terminated the relationship with **Synnefo**, and whether or not such termination is in violation of such personnel's agreement with **Synnefo**, **Synnefo** shall notify **Eastern** of such termination.

9. <u>**INTELLECTUAL PROPERTY RIGHTS.**</u> **Synnefo** agrees that all material, documentation, deliverables and other tangible expressions of information including but not limited to software programs and software documentation, designs, technical data, formulae, and processes, whether in final production or draft, which result from any work performed by any technical personnel providing services under this Agreement shall be deemed to be works for hire and all rights, title and interest, including any copyright, patent rights and all other intellectual property rights, shall belong exclusively to **Eastern** unless some other arrangements have been agreed to by both parties or by **Eastern** and such technical personnel, as appropriate, in writing.

10. <u>**CONFIDENTIALITY.**</u> **Synnefo** agrees that it will not disclose to any party any information learned by it which has been clearly marked "Confidential" by **Eastern**, except as such disclosure is necessary on an individual basis to technical personnel whom **Synnefo** has located for **Eastern**. **Eastern** may request the technical personnel covered by this Agreement to execute a separate agreement not to disclose the **Eastern**'s Confidential information. **Eastern** shall not request of the technical personnel providing services under this Agreement any information regarding the rate(s) and other terms of remuneration agreed to between **Synnefo** and such technical personnel, nor shall **Eastern** induce such technical personnel to provide such information, nor shall **Eastern** disclose or permit to be disclosed to such personnel, directly or through another party, any information regarding the rate(s) or other terms of remuneration agreed to between **Eastern** and **Synnefo**. As **Synnefo** considers such information to be "Confidential", **Eastern** agrees to notify **Synnefo** immediately if such rate(s) or other terms are disclosed to it by any technical personnel or any other party, or if it learns that any technical personnel have received information about the rate(s) or other such terms agreed to between **Eastern** and **Synnefo**.

11. <u>**EXCISE, SALES, ETC. TAXES ON SERVICES.**</u> There shall be added to any charges payable by **Eastern** under this Agreement amounts equal to any and all applicable taxes, however designated, levied or based on any charges payable under this Agreement or the services rendered hereunder, including without limitation state and local privilege, excise, sales, and use taxes and any taxes or amounts in lieu thereof paid or payable by **Synnefo**, but excluding taxes based upon the net income of **Synnefo**. **Eastern** shall be billed by **Synnefo** before or within a reasonable time following payment of such taxes by **Synnefo**, and such amounts shall be due and payable by **Eastern** promptly following billing thereof, whether or not such billing occurs following completion of the services hereunder.

12. **INSURANCE.** **Synnefo** will procure and maintain in effect during the term of this Agreement appropriate insurance coverage. Upon request, **Synnefo** will provide **Eastern** with certificates of insurance according to industry standards in format acceptable to **Eastern**.

13. **LIABILITY AND INDEMNIFICATION.** In connection with the services provided generally under this Agreement and specifically by a particular technical personnel, in no event shall either party be liable to the other for damages to any property or person or for indemnification in an amount greater than the amount paid by **Eastern** in connection with the performance of such services by such personnel whose actions or omissions are the basis for such damages or indemnification; provided, however, that either party shall not be liable for any damages whatsoever caused by any acts or omissions beyond its control or not due to its fault, or for any special or consequential damages, loss of profits, interest, penalties or fines; and provided further, that if either party requests or directs that the other party perform an act or omit the performance of an act, and if that party performs or omits the performance of such act as directed or requested, or if the other approves, affirms or ratifies the performance or omission of any act of the other, then notwithstanding anything in any section of this Agreement, either party shall have no claim against the other for liability or indemnification in connection with such act or omission to act. In the event that either party performs, or omits to perform, any act which may support a claim for liability or for indemnification by the other, then that party shall give prompt written notice to the other upon its initial receipt of information that could reasonably support such claim, and failure to give such timely notice shall constitute a waiver of such claim. Either party shall have the right to defend, or cause the other to defend, any claim for indemnification and that party shall extend reasonable cooperation in connection with such defense, which shall be at the other's expense. Either party or its designated representative shall also have the sole right to settle any such claim for indemnification if such settlement includes a complete release of the other party. Either party may at its expense participate in the defense of any such claim for indemnification if its position is not materially inconsistent with that of the other party and if in its reasonable judgment such claim or the resolution thereof would have an ongoing material effect. In the event one party fails to defend the same within a reasonable length of time, the other shall be entitled to assume the sole defense thereof, and that party shall be liable to repay the other for all expenses reasonably incurred in connection with said defense (including reasonable attorneys' fees and settlement payments) if it is determined that such request for indemnification was proper.

14. **TERMINATION OF THIS AGREEMENT.** This Agreement will continue in effect until terminated by **Eastern** or **Synnefo** at any time upon the terminating party giving not less than 30 days notice to the non-terminating party. Such termination of this Agreement shall not affect any technical personnel providing services under it unless such personnel are terminated in accordance with the terms of section 8 of this Agreement.

15. **ASSIGNMENT.** Neither this Agreement nor any interest hereunder may be assigned or otherwise transferred by either party to third parties other than affiliates of either party without the prior written consent of the other party which shall not be unreasonably withheld. This Agreement shall be binding upon and inure to the benefit of the heirs, successors, assigns, and delegates of the parties hereto.

16. **NOTICES.** Any requirement to "notify", or for "notice" or "notification", in connection with the subject matter of this Agreement shall be in writing and shall be effective when delivered personally (including by Federal Express, Express Mail, or similar courier service) to the party for whom intended, or five (5) days following deposit of the same into the United States mail, certified mail, return receipt requested, first class postage prepaid, addressed to such party at the address set

forth below its signature to this Agreement.  Either party may designate a different address by notice to the other given in accordance herewith.

17.  **SEVERABILITY**.  If any term or provision of this Agreement shall be found to be illegal or otherwise unenforceable, the same shall not invalidate the whole of this Agreement, but such term or provision shall be deemed modified to the extent necessary by the adjudication to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly, preserving to the fullest permissible extent the intent and agreements of the parties herein set forth.

18.  **COMPLETE AGREEMENT AND AMENDMENT.**  This Agreement and any written Purchase Orders executed hereunder contain the entire agreement between that parties hereto with respect to the matters covered herein.  **Eastern** acknowledges that it is entering into this Agreement solely on the basis of the agreements and representations contained herein.  This Agreement shall not be modified in any way except in writing signed by both parties and stating expressly that it constitutes a modification of this Agreement.

19.  **LAW AND DISPUTES.**  This Agreement shall be governed by the laws of the State of New Jersey.  All claims against either party to this Agreement shall be brought by the other party no later than one (1) year after such claims have arisen (except for claims for non-payment for services, which may be brought within two (2) years after the last date of services for which payment is sought).  Except as stated below in this section, any controversy or claim, whether such claim arises in contract, tort, or otherwise, including, but not limited to, claims for employment discrimination (whether under Title VII of the Civil Rights Act of 1964, as amended from time to time, the Age Discrimination in Employment Act, or state and local laws), arising out of or relating to this Agreement, or the breach thereof, or the commercial or economic relationship of the parties hereto, shall be submitted to arbitration in accordance the rules of the American Arbitration Association then obtaining as modified hereby.  Any award resulting from arbitration authorized by this Agreement shall be binding and conclusive upon all parties.  Notwithstanding the obligation to pursue other claims through arbitration, a party may file with a court claims for injunctive relief to prevent or limit the disclosure of confidential information protected under this Agreement and claims for injunctive relief to prevent the hiring or similar retention of technical personnel by the **Eastern** other than through **Synnefo** in cases where **Synnefo** has not consented to such hiring or retention.  Any lawsuits or agreed arbitrations (or award enforcement proceedings) pertaining to this Agreement or the services provided hereunder shall be brought in the federal or state courts in the State of New Jersey.

IN WITNESS HEREOF, the parties have caused this Agreement to be executed by their authorized agents as of the date written above.

SYNNEFO TECHNOLOGY SOLUTIONS INC.

By:

Signed

MATHEW KOSHY

Print Name

PRESIDENT

Title

JULY 01, 2010

Date

EASTERN COMPUTER EXCHANGE, INC.

By:

Signed

Print Name

Title

Date

# EXHIBIT B

## CONFIDENTIALITY AND
## NON-DISCLOSURE AGREEMENT

This Confidentiality and Non-Disclosure Agreement ("Agreement") is entered into by and between Eastern Computer Exchange, Inc., (Collectively "Eastern"), and Synnefo Technology Solutions, Inc. for itself and on behalf of its Affiliates and Representatives and Officers, (Collectively "SYNNEFO"), and shall be effective on and after July 1, 2010 (its "Effective Date").

**Recitals.**

Eastern and SYNNEFO have requested that each party furnish the other with certain information which is considered confidential and proprietary. Each party may also obtain additional information regarding the other during the course of discussions or negotiations between the parties that prompted the original request for information (the "Parties' Discussions"). The purpose of this Agreement is to set forth the terms and conditions under which such information will be disclosed. As an inducement to each party furnishing the other with the information, and as a condition to each party furnishing such information to the other, each party agrees that it will, and will cause each of its Representatives (as defined herein) to comply with the provisions hereof.

1.     "Affiliate" means an entity that directly or indirectly: controls, is controlled by, or is under common control with a party to this Agreement.

2.     "Confidential Information" shall mean all oral and written information concerning the subject matter of the Parties' Discussions, and any and all information regarding each parties' business operations, including, but not limited to, any information regarding its products and related services, services, projects, volume and similar data, business plans, programs, facilities, financial statements, budgets, cash flow projections, tax information, patient volume, subscribers, fee schedules, vendors, customers referral sources, and that is: 1) is marked, otherwise identified as, legally entitled to protection as, or is of the type or nature that a reasonable person would understand it to be confidential, proprietary, privileged or trade secret information; and (2) is disclosed by or on behalf of a party (the "Disclosing Party") to the other party (the "Receiving Party") related to the Parties' Discussions.

3.     "Representatives" means a party's officers, directors, members, employees, consultants, agents or business associates, who receive Confidential Information and/or participate in the Parties' Discussions pursuant to this Agreement.

4.     The Receiving Party agrees that it will, and will cause its Representatives to, maintain in confidence all Confidential Information. In this regard, the Receiving Party agrees to disclose Confidential Information only to Representatives who need to know such information for the purpose of the Parties' Discussions and shall take all necessary and reasonable precautions to prevent such Confidential Information from being disclosed or provided to any unauthorized person. The Receiving Party agrees that it will not, and will cause its Representatives not to, use Confidential Information for any purpose other

1

than the purpose of the Parties' Discussions without first obtaining the Disclosing Party's express written consent. Receiving Party shall be responsible for any improper disclosure or use of Confidential Information by any of its Representatives. The term "person" as used in this Agreement will be interpreted broadly to include, without limitation, any corporation, company, partnership, limited liability company, natural person or government entity.

5.      In the event the Receiving Party or any of its Representatives is requested or becomes legally compelled (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, then the party so requested or compelled shall provide the Disclosing Party with prompt written notice of such request or requirement so that the Disclosing Party may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this Agreement. In the event that such protective order or other remedy is not obtained, or that the Disclosing Party waives compliance with the provisions hereof, the party so requested or compelled agrees to furnish only that portion of the Confidential Information that it is advised by counsel is legally required to be disclosed and to exercise reasonable efforts to obtain assurance that confidential treatment will be accorded the Confidential Information.

6.      Upon written notice from the Disclosing Party, the Receiving Party agrees to immediately return all Confidential Information and any copies in whatever medium utilized containing any such Confidential Information. In addition, the Receiving Party agrees to destroy all copies of any analyses, compilations and studies or other documents including notes and other writings that it prepared containing or reflecting any Confidential Information, and shall certify in writing to the other that such destruction has occurred.

7.      Except as may be necessary, in the opinion of counsel, to comply with the requirements of law, governmental regulation without the prior written consent of the Disclosing Party, the Receiving Party will not, and will direct its Representatives not to, disclose to any person either the fact that the Parties Discussions or that the Disclosing Party or the Receiving Party has requested or received any information, including Confidential Information, from the other party, or any terms, conditions or other facts with respect to the Parties Discussions, including the status thereof.

8.      The parties agree that remedies at law for any actual or threatened breach by Receiving Party of the provisions of this Agreement would be inadequate. Accordingly, the Receiving Party acknowledges and agrees in advance that in the event of any actual or threatened breach of the provisions of this Agreement by it, and without prejudice to any rights and remedies otherwise available to the Disclosing Party, the Disclosing Party will be entitled (a) to equitable relief, including by way of injunction and (b) to compel specific performance without the need of proof of actual damages. The Receiving Party further agrees to and hereby does waive any requirement for the securing or posting of any bond by the Disclosing Party in connection with such remedies.

2

9.     If any article under this agreement is deemed unenforceable for any reason, the parties to enforce the balance of the Agreement, which shall be deemed amended to delete or modify, as necessary, the invalid or unenforceable provisions. The parties further agree to alter the balance of this Agreement in order to render the same valid and enforceable.

10.    This Agreement constitutes the full understanding of the parties and a complete and exclusive statement of the terms and conditions of their agreement relating to the subject matter hereof and supersedes any and all prior agreements, whether written or oral, that may exist between the parties with respect thereto. Except as otherwise specifically provided in this Agreement, this Agreement shall be modified in writing by consent of the parties.

11.    The restrictions expressed in this Agreement are in no way to supersede or eliminate any rights which the parties otherwise may have pursuant to state or federal law pertaining to trade secrets or proprietary information.

12.    It is further understood and agreed that no failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

13.    This Agreement will be governed by and construed in accordance with the laws of the State of Connecticut.

14.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, executors and administrators of the parties hereto.

This Agreement may be executed by facsimile transmission and in two or more counterparts, each of which shall be deemed an original and which, when taken together, shall constitute one and the same instrument. Any signatures delivered by a party by facsimile transmission or by e-mail transmission, including in Adobe portable document format, shall be deemed an original signature.

IN WITNESS WHEREOF, the parties have executed this Agreement intending to be bound on and after its Effective Date.

**Eastern Computer Exchange, Inc.**          **Synnefo Technology Solutions, Inc.**

By: _____          By: _KARL KOSHY_____

Title: _____          Title: _MANAGING DIRECTOR_____

Signature: _____          Signature: _____

Date: _____          Date: _7/9/2010_____

3